Filed 10/16/20  P. v. Quiroz CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E069820 |
| v. | (Super.Ct.No. RIF1601573) |
| JOSE QUIROZ et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Bernard Schwartz, Judge.

Affirmed in part; reversed in part and remanded for resentencing.

Ron Boyer, under appointment by the Court of Appeal, for Defendant and

Appellant Jose Quiroz.

Jason L. Jones, under appointment by the Court of Appeal, for Defendant and

Appellant Andres Bonilla.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Felicity

Senoski, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendants and appellants Jose Quiroz and Andres Bonilla (collectively, defendants), along with Raymond Martinez Quiroz Munoz III, and Robert T.,[1] were involved in shooting at a car that they knew belonged to Leonardo A., with whom they were upset for taking Robert's[2] cellular telephone. Tawni N. and Alberto G. were also in the car, but due to the dark tinted windows, could not be seen. Alberto and Leonardo were severely injured in the shooting. Defendants were convicted of conspiracy to commit murder; premeditated, deliberate and willful attempted murder; first degree burglary; and Bonilla was convicted of shooting at an occupied vehicle.

Quiroz claims on appeal that (1) his life sentences on the attempted murders of Leonardo, Tawni and Alberto must be reversed because he was not charged with premeditation and deliberation in the information in violation of his due process rights; (2) the Penal Code section 12022[3] enhancements found true against him must be reversed because they were not charged in the information; (3) his conviction of conspiracy to kill Tawni must be reversed because the evidence was insufficient to show he had the intent to kill Tawni; (4) his conviction of conspiracy to kill Tawni or Leonardo must be reversed because the jury only found one conspiracy; (5) his two convictions of

---

[1] Robert and Munoz were charged with Defendants. Robert pleaded guilty prior to trial and was sentenced to 16 years. He testified against defendants. The jury was deadlocked as to Munoz's guilt and a mistrial was declared.

[2] We refer to some witnesses by their first names for clarity due to shared last names and/or to preserve their anonymity (Cal. Rules of Court, rule 8.90(b)). No disrespect is intended.

[3] All further statutory references are to the Penal Code unless otherwise indicated.

attempted murder against Tawni and Alberto should be reversed for insufficient evidence because there was no evidence he had the intent to create a kill zone; (6) insufficient evidence was presented to support that Quiroz had the premeditated and deliberate intent to create a kill zone requiring reversal of the attempted murders of Tawni and Alberto; (7) there could be no premeditated and deliberate attempted murder of Alberto and Tawni based on the natural and probable consequences theory; (8) the attempted murder of Alberto must be reversed because it was based on the intent to kill Tawni; and (9) the trial court's comments to the jury during voir dire regarding witness testimony conflicted with the predeliberation instructions and were prejudicial. In supplemental briefing, Quiroz contends that his convictions of the attempted murder of Tawni and Alberto must be reversed based on California Supreme Court case *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*), which significantly restricted the kill zone theory.

Bonilla claims on appeal that (1) as argued by Quiroz, Bonilla's life sentences on the attempted murder convictions must be reversed because the information did not plead that the attempted murders were premeditated and deliberate; (2) the instruction on kill zone theory was improper; (3) his convictions of the attempted murders of Tawni and Alberto must be reversed because defendants did not know Tawni and Alberto were in the car; (4) a special instruction on the kill zone theory based on the language of *People v. Adams* (2008) 169 Cal.App.4th 1023 was improperly given to the jury; (5) his attempted murder conviction of Alberto must reversed because it was based on a finding that he had the intent to kill Tawni; (6) improper instruction on the conspiracy to kill Tawni requires reversal of his conviction of conspiracy to kill Tawni; (7) the conspiracy

3

to murder Tawni, and the attempted murder of Tawni and Alberto must be reversed for insufficient evidence because there was no evidence of the intent to kill Tawni; and (8) he is entitled to additional presentence custody credits. Bonilla also contends that *Canizales*, *supra*, requires reversal of his convictions of the attempted murders of Tawni and Alberto.

## FACTUAL AND PROCEDURAL HISTORY

### A.    PROCEDURAL HISTORY

Defendants were charged in an information filed by the Riverside County District Attorney's Office in count 1 with conspiracy to commit the murder of Tawni (§ 182, subd. (a)(1)). The overt acts alleged were (1) defendants went to 20200 Hunter Road looking for Tawni; (2) Quiroz called Leonardo and asked him to meet; (3) Quiroz followed Leonardo's vehicle; and (4) Munoz and Bonilla shot at Leonardo's vehicle multiple times. In count 2, defendants were charged with conspiracy to commit the murder of Leonardo (§ 182, subd. (a)(1)). The overt acts for count 2 were (1) defendants went to 20200 Hunter Road looking for Leonardo; (2) Quiroz called Leonardo and asked him to meet; (3) Quiroz followed Leonardo's vehicle; and (4) Munoz and Bonilla shot at Leonardo's vehicle multiple times. In counts 3, 4, and 5, defendants were charged with the attempted murders of Tawni, Leonardo and Alberto, respectively, within the meaning of sections 664 and 187, subd. (a). It was additionally alleged as to counts 3, 4, and 5, that defendants personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) and for counts 4 and 5, that they personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). Defendants were charged in

4

count 6 with burglary (§ 459). It was further alleged as to count 6, that defendants both personally used a firearm within the meaning of section 12022.53, subdivision (b).

The information was amended to change the gun allegation to a violation of section 12022.5, subdivision (a), for count 6 for Quiroz. The trial court dismissed the section 12022.53 weapons-use allegations against Quiroz on counts 3, 4, and 5 but allowed the People to pursue principal armed allegations pursuant to section 12022, subdivision (a)(1). The trial court added a charge of shooting at an occupied vehicle for Bonilla within the meaning of section 246 as count 7. It was further alleged for count 7, that Bonilla personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (d).

Defendants were found guilty of all counts. The jurors made specific findings as to counts 3, 4, and 5 that the attempted murders were committed with premeditation and deliberation. The jury found all of the gun allegations true; except the allegation for count 6 as to Quiroz within the meaning of section 12022.5, subdivision (a), was found not true.

Quiroz was sentenced on counts 1 and 2 to 25 years to life, which were to run consecutive to each other. On count 5, he was sentenced to life, with a minimum parole eligibility of seven years, plus one year for the weapons-use enhancement, which was to run consecutive to counts 1 and 2. He received an indeterminate sentence of 57 years to life, plus a one-year determinate term.

Bonilla was sentenced on count 3 to life with minimum parole eligibility of seven years, plus 20 years for the weapons use enhancement found true pursuant to 12022.53,

5

subdivision (c). On count 4, he received a sentence of seven years to life, plus 25 years to life for the 12022.53, subdivision (d), enhancement, which was to run consecutive to count 3. On count 5, he was sentenced to seven years to life, plus 25 years to life under 12022.53, subdivision (d), which was to run consecutive to counts 3 and 4. Bonilla was sentenced to a total prison term of 71 years to life, plus a determinate term of 20 years.

## B. FACTUAL HISTORY

### 1. *SHOOTING*

#### a. Rebekkah R.

In March 2016, Rebekkah R. was friends with Bonilla, Alberto, Robert, Tawni and Leonardo. She and her boyfriend, Hayden N., were staying with Leonardo in a trailer located on Hunter Street in Mead Valley. Rebekkah was a heavy user of heroin and methamphetamine at the time.

On March 27, 2016, Rebekkah was with Tawni, Leonardo, Hayden, and Alberto. They drove to Robert's house in Leonardo's car and Robert walked out to the car. Rebekkah was in the backseat with Hayden and Alberto. Leonardo was driving and Tawni was in the front passenger's seat. When Robert got to the car, Tawni took his cellular telephone and pushed him. Robert fell down and they drove off.

Rebekkah explained that they had taken Robert's phone so that Leonardo could get in touch with a girl named Janice. On March 28, Robert went with Janice to the trailer and Leonardo gave Robert his phone back. Janice and Robert left the trailer.

That night, Hayden and Rebekkah were in the trailer; Alberto, Leonardo and Tawni had driven to a Del Taco restaurant together and had not returned. A white pickup

6

truck pulled up to the trailer. Hayden ran to lock the front door to the trailer. As he was running to the back of the trailer to lock the back door, it was kicked open. Bonilla entered the trailer and was holding a pistol. Quiroz, who also had a gun, and Munoz, entered after Bonilla. They were looking for Leonardo. The three men searched the rooms in the trailer for Leonardo.

Quiroz left the trailer and came back with Robert. Quiroz was leading Robert by holding onto the back of his neck.[4] Quiroz directed Robert to sit down at the kitchen table. Quiroz asked Robert if Rebekkah was the woman who took his cellular telephone. Robert told him no.

One of the men received a telephone call and they all quickly left the trailer. Rebekkah called Leonardo. She told them not to come home. Hayden and Rebekkah left the trailer because they were scared.

The day after the shooting, Rebekkah and Hayden went to a drug house called the "Ranch." Robert and Bonilla were there. Tawni was also at the Ranch despite being shot at the prior night.

b. Tawni

Tawni was with Leonardo, Alberto, Hayden, and Rebekkah on March 27.[5] They went to Robert's house. Leonardo wanted Robert's phone to get Janice's phone number. Tawni took Robert's phone and then pushed him. Robert was given back his phone the

---

[4] Robert did not have a gun.

[5] Tawni was incarcerated at the time of her testimony. She was afraid to testify because she did not want to be labeled a "snitch."

7

following day.  Tawni was using methamphetamine and marijuana continuously at the time of the shooting.

On the night of March 28, Tawni drove Leonardo and Alberto to get food.  Tawni was driving, Leonardo was in the passenger's seat, and Alberto was in the backseat.  After they ate, they just drove around using drugs and listening to music.  Leonardo received a phone call.  They saw a pickup truck drive past them, which made a U-turn and started following them.  Tawni asked Leonardo what they should do and he said to keep driving.  Tawni continued to drive and the truck followed them.

Tawni drove onto a dark street and someone from the truck started shooting at them.  Multiple shots were fired and it sounded like more than one gun was being fired.  She heard at least eight shots.  Tawni ducked down and kept driving.  Leonardo was shot on the side of his head and he was bleeding.  Alberto yelled that he was shot.  He was laying down on the backseat with his eyes closed, holding his stomach where he had been shot.  Tawni told him to stay awake.  Tawni drove toward a hospital and Leonardo dialed 911.  On the way to the hospital, they saw an ambulance; Tawni stopped at the ambulance and the police arrived at their location shortly thereafter.

The windows on Leonardo's car were tinted very dark and it was hard to see out.  Tawni had no idea who was shooting at them.  All the bullet holes on Leonardo's vehicle were from the shooting.  No one in the car with Tawni had a gun.  Tawni went with Hayden and Rebekkah to the Ranch the morning after the shooting.  Robert was at the Ranch.  She accused him of being involved in the shooting.  Nothing else happened between them.

8

c.    <u>Alberto</u>

Alberto was friends with Leonardo, Rebekkah, Hayden, and Tawni. He was close friends with Robert. He was with Leonardo, Rebekkah, Hayden, and Tawni when Robert's phone was taken. It happened quickly and he did not know they were going to take it.

On March 28, Alberto, Leonardo and Tawni went in Leonardo's car to Del Taco to get food. Tawni was driving, Leonardo was in the passenger's seat, and Alberto was in the backseat. Leonardo yelled that a truck was following them, but Alberto did not recall if he saw a truck. Alberto heard a shot and felt that he was shot in the stomach. He was shot a second time in the stomach. He was shot a third time under his armpit. He shouted that he had been shot. He said his "guts fell out" and he passed out. The next memory he had was waking up in the hospital.

Alberto was in the hospital for over one month. He had three surgeries. His gunshot wounds were life threatening. He still had an open wound on his stomach. He did not know who shot him.

d.    <u>Leonardo</u>

Leonardo lived on Hunter Street in Mead Valley in both the trailer and the house on the property. He considered Robert to be a friend. He went to Robert's house with only Tawni on March 27. He wanted Robert's cellular telephone in order to get a phone number for a girl named Janice who Leo was dating. Tawni took the phone and pushed Robert. Robert came to Leonardo's trailer on March 28 and got back his phone. Robert

9

told Leonardo that it was "fucked up" that they took his phone and that they were going to pay for it. Leonardo took it as a joke, not a threat.

Later on the night of March 28, Leonardo, Tawni and Alberto went to Del Taco. Tawni was driving Leonardo's car. While they were driving home, he received a phone call from Robert asking Leonardo to meet him. Leonardo received a second call. He thought it was Robert but it was clearly not Robert's voice. When Leonardo accused the caller of not being Robert, the person responded that it was Robert and that he had "grown balls." The caller told Leonardo to hurry up and meet them.

When they arrived at the designated location, a white truck tried to run them off the road. Leonardo directed Tawni to drive faster and then the persons in the white truck started shooting at them. Leonardo was shot somewhere on his head and was bleeding. Alberto was in the backseat screaming. There was blood in the backseat. Leonardo could not see who was in the white truck and could not tell how many persons were shooting at them. There were numerous shots fired.

Leonardo went to the hospital. He had been shot in the ear. A bullet was still lodged near his ear that could not be removed and his ear was disfigured. Leonardo, Tawni, and Alberto were all high on methamphetamine at the time they were shot. Leonardo did not know Munoz.

e.     Robert

Robert was originally charged with attempted murder and conspiracy to commit the murders of Leonardo, Tawni, and Alberto. He pleaded guilty prior to trial and received a sentence of 16 years.

On March 27, 2016, he was at his home in Mead Valley. He had been friends with Tawni since he was 14 years old. He had only known Leonardo and Rebekkah for a few months. He had known Alberto since middle school. On that day, he received a call from Tawni asking if he wanted to go to the store with her. Tawni, Leonardo, Alberto and two other people came over to his house in Leonardo's car approximately 20 minutes later. When they arrived, Tawni asked to see his cellular telephone and tried to take it from him. They struggled and Tawni pushed him to the ground. They drove off with his phone. Robert was "pissed off" and wanted his phone back.

Robert called Quiroz to see if he would take him to Leonardo's trailer to get his phone. Quiroz told him to call the next day. Either Tawni or Leonardo called Janice the next day and told her that Robert could pick up his phone. He and Janice went to Leonardo's trailer on March 28 and got the phone from Hayden. Robert called Quiroz and let him know he got his phone back. Robert denied telling Leonardo that he was going to pay for taking Robert's phone.

The evening of March 28 he got a call from Quiroz. Quiroz told Robert that he was coming to get him. Quiroz drove up in his truck. Robert could not see inside the truck because the windows were tinted. Robert got into the truck and Quiroz asked him where Leonardo lived. Munoz and Bonilla were in the backseat. Robert directed Quiroz to Robert's trailer. Quiroz told Robert he was tired of people messing with Robert.

As they were driving, Bonilla loaded a handgun. They pulled up to the trailer when they did not see Leonardo's car. Bonilla was the first one to enter the trailer, followed by Quiroz and Munoz. A few minutes later, Quiroz came back to the truck and

11

directed Robert into the trailer. Rebekkah and Hayden were inside the trailer. Munoz had a large caliber weapon in his hands.

Quiroz asked Rebekkah and Hayden where Leonardo was; he did not recall them asking for Tawni. Robert only saw two guns while they were in the trailer. They decided to leave when they realized Leonardo was not at the trailer. Quiroz had Robert call Leonardo. Robert told Leonardo he wanted to meet up to buy drugs. The intention was not to buy drugs but they used it as an excuse to meet up with Leonardo. Leonardo hung up on him. Quiroz told Robert to call him back. As soon as he dialed, Quiroz took the phone from him. Quiroz pretended he was Robert and asked Leonardo where he was at but Leonardo hung up. Quiroz decided to drive Robert home but on the way Robert pointed out Leonardo's car as it drove past them going the opposite direction. Robert could not see into Leonardo's car to see who was inside because the windows were tinted dark. They presumed Leonardo was driving the car because it was his car. Robert did not know of any plan to shoot at the car.

Quiroz made a U-turn and started following Leonardo. Leonardo kept driving and Quiroz kept pace with them. As they were driving, Munoz loaded a gun. Robert was sitting in the backseat on the passenger's side. Quiroz told Bonilla and Munoz to start shooting. Bonilla and Munoz asked Quiroz if he was sure and Quiroz responded to shoot them. Robert and Bonilla switched sides in the backseat when Quiroz told Bonilla and Munoz to shoot. Defendant Munoz was in the passenger's seat. Bonilla and Munoz rolled down their windows and started shooting at Leonardo's car.

12

Munoz had a rifle and Bonilla had a nine-millimeter handgun. One of them shot until he ran out ammunition and then the other one shot at the vehicle. Bonilla and Munoz both reloaded their guns and fired again. Both were hanging out of the windows when they were shooting. They stopped shooting when they ran out of ammunition and they had reached a main road. Quiroz never had a gun.

Quiroz drove Robert back to his house. Robert tried to talk but Quiroz told him to be quiet. The next day, Robert saw Rebekkah, Tawni, and Hayden at the Ranch. They accused Robert of being involved in the shooting. He admitted that he was in the truck but denied that he was the shooter. Nothing else happened between them.

2. *INVESTIGATION*

Detective John Wyatt interviewed Rebekkah on March 30, 2016. Rebekkah was afraid that the people who shot Alberto and Leonardo would kill her if they found out she told on them. Rebekkah stated that she was at the trailer by herself on March 28. Leonardo, Tawni, and Alberto left to go to Del Taco. While she was at the trailer, she saw a vehicle drive up. She went to lock the doors to the trailer, but Bonilla kicked in the door and was holding a pistol. Quiroz entered the trailer. He owned the truck that they came to the trailer in. Munoz also entered the trailer. Quiroz went out of the trailer and led Robert back into the trailer. Quiroz asked Robert if Rebekkah was the woman who took his phone and Robert said no.

Munoz had a gun that was bigger than the one possessed by Bonilla. The men remained at the trailer waiting for Leonardo to return. The men received a telephone call and they all left. Rebekkah texted Leonardo, "Don't come home." Tawni called her 30

13

minutes later and told her they had been shot at. Rebekkah identified Quiroz and Munoz from six-pack photographic lineups.

Nine shell casings were located on the street where the shooting occurred. Some of the casings were nine millimeter and the others were 7.62 by 39.

Detective Wyatt examined Leonardo's vehicle. He located eight bullet holes. Two bullets entered near the rear license plate and entered the trunk. A bullet went into the left rear taillight. A bullet hole went through the lid of the trunk and through to the trunk. It was consistent with the shots being fired from a car that was sitting higher than Leonardo's car. A bullet hole impacted the side of the car just behind the left rear passenger door and the bullet was not found. A bullet went through the roof near the left rear passenger door. It entered the car, went over the driver's seat and exited through the front windshield. A bullet entered the back windshield and likely was one of the bullets that struck Alberto. The bullets that entered the trunk area also entered into the passenger area likely hitting Alberto. There were two bullet holes in the backseat, which likely were from the bullets that hit Alberto.

Detective Wyatt also interviewed Robert. At first, Robert lied that he did not know the identities of the two shooters because they were wearing masks. He also said that he was dropped off before the shooting. Robert was interviewed a second time and identified Bonilla and Munoz as the shooters. Munoz had already been arrested.

Detective Wyatt interviewed Quiroz on March 31, 2016, after Robert advised him that Quiroz was driving the truck during the shooting. Quiroz initially denied any involvement in the shooting or that he knew Leonardo, Alberto, or Tawni. Quiroz later

14

admitted he was driving the truck during the shooting. Quiroz was contacted by Robert to help him get his phone back.

Quiroz picked up Robert at his home. Quiroz refused to divulge who else was in the truck with them. Robert called Leonardo from the truck while they were driving. Quiroz admitted he got on the phone with Leonardo. He admitted that when he saw Leonardo's car, he made a U-turn and followed the car. Quiroz did not have a gun during the incident.

A home where Munoz and Quiroz were staying was searched. In a laundry basket near where Munoz normally slept, a magazine that used 7.62 by 39 ammunition was found. A month after the shooting, Bonilla was approached by two officers at a coffee shop. Bonilla immediately disclosed that he was in possession of gun. A nine-millimeter, semiautomatic firearm was found in his waistband; it was loaded. An additional loaded magazine was found in his pocket. The nine-millimeter shell casings found at the shooting scene matched the gun found in Bonilla's possession.

### 3. *DEFENSE*

Defendants did not present any evidence.

## DISCUSSION

### A. KILL ZONE—ATTEMPTED MURDERS OF TAWNI AND ALBERTO

Defendants made several claims in their opening briefs that their convictions of the attempted murders of Tawni and Alberto should be reversed based on several instructional errors on the kill zone theory and insufficient evidence that they intended to create a kill zone.

15

On June 24, 2019, after the briefs were filed in this court, the California Supreme Court issued its opinion in *Canizales*, *supra*, 7 Cal.5th 591, which significantly restricted the kill zone theory of attempted murder. We gave Defendants and the People the opportunity to address *Canizales* in supplemental briefing. Following the California Supreme Court's decision in *Canizales*, we find that the trial court erred by instructing the jurors on the kill zone theory as the circumstances of this case do not support that the only reasonable inference from the evidence was that defendants intended to kill everyone in the zone of fatal harm to ensure the death of the primary target, Leonardo. Such instruction to the jury was prejudicial. We will therefore reverse the convictions for attempted murder related to Tawni and Alberto.

1.    *KILL ZONE*

"Attempted murder requires proof of a direct but ineffectual act done towards killing another human being and the specific intent to unlawfully kill another human being. [Citations.] Unlike the mental state for murder, which does not require an intent to kill but only a conscious disregard for life (implied malice), 'attempted murder requires the specific intent to kill.' " (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1242.) "[I]ntent to kill does not transfer to victims who are not killed, and thus 'transferred intent' cannot serve as a basis for a finding of attempted murder." (*People v. Perez* (2010) 50 Cal.4th 222, 232; see *People v. Bland* (2002) 28 Cal.4th 313, 326-327 (*Bland*).) "To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and

16

attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Bland*, at p. 328.) However, ". . . , the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it termed the 'kill zone' " for attempted murder. (*Id.* at p. 329.)

In *Bland*, *supra*, 28 Cal.4th at pp. 318-320, 330-333, a gang member approached a vehicle, which contained the intended target and two passengers. The gang member shot at the driver with a .38-caliber handgun and the driver tried to drive away. The gang member and his cohort shot at the vehicle killing the intended target and wounding the passengers. (*Id.* at p. 318.) The gang member was convicted of attempted premeditated and deliberate murder of the passengers based on creating a kill zone by firing numerous bullets into the car. (*Id.* at pp. 318, 330-331.)

The *Bland* court found that even if the jury concluded that the defendant primarily intended to kill the driver, "it could reasonably also have found a *concurrent* intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone. Such a finding fully supports attempted murder convictions as to the passengers." (*Bland*, *supra*, 28 Cal.4th. at pp. 330-331, fn. omitted.) It found that the evidence "virtually compelled" a finding that the defendant intended to create a kill zone. (*Id.* at p. 333.)

In *Canizales*, *supra*, 7 Cal.5th 591, the California Supreme Court did not reverse *Bland* but significantly restricted the kill zone theory. In *Canizales*, between 10 and 30 people were at an outdoor party. (*Canizales*, at p. 599.) The victims ran away when defendant's cohort shot multiple times. (*Id.* at p. 600.) The intended targets were not hit

17

by any of the bullets, but a bystander was struck. Five casings were found at the scene. (*Ibid.*)

The California Supreme Court in *Canizales* addressed the kill zone theory and held, "[T]he kill zone theory for establishing the specific intent to kill required for conviction of attempted murder may properly be applied only when a jury concludes: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target; and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone with the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

The court created the following rule: "In determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target. Evidence that a defendant who intends to kill a primary target acted with only conscious disregard of the risk of serious injury or death for those around a primary target does not satisfy the kill zone theory . . . the kill zone theory does not apply where the 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a

18

primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located. In the absence of such evidence, the kill zone instruction should not be given.' We believe our formulation of the kill zone theory here guards against the potential misapplication of the theory, and is consistent with *Bland* . . . and the prosecution's burden of proving each element of an offense beyond a reasonable doubt." (*Canizales*, *supra*, 7 Cal.5th at p. 607, fn. omitted.) The California Supreme Court concluded, "We emphasize that going forward trial courts must exercise caution when determining whether to permit the jury to rely upon the kill zone theory. Indeed, we anticipate there will be relatively few cases in which the theory will be applicable and an instruction appropriate." (*Canizales*, *supra*, 7 Cal.5th at p. 608.)

The California Supreme Court found there was insufficient evidence to give the kill zone instruction. (*Canizales*, *supra*, 7 Cal.5th at pp. 609-611.) The court found that although there was a primary target, the circumstances of the attack did not support the instruction. It noted that the "number of shots fired" was only one part of the circumstances to consider; the proximity and location of the shots was important. Since the defendant was at least 100 feet away from the primary target and the victims had a means of escape, there was insufficient evidence of an intent to create a kill zone. (*Id.* at pp. 610-611.)

Here, the jury was instructed with CALCRIM No. 600 for the attempted murders of Tawni, Alberto and Leonardo that they must find that defendants "took at least one direct but ineffective step towards killing another person" and the defendants "intended to kill that person." They were further instructed, "A person may intend to kill a specific

19

victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone. In order to convict a defendant of the attempted murder charges, the People must prove that a defendant not only intended to kill Leonardo . . ., but also intended to kill Tawni . . . and/or Alberto . . ., or intended to kill everyone within the kill zone. If you have a reasonable doubt whether a defendant intended to kill Tawni . . . and/or Alberto . . ., or intended to kill Leonardo . . ., by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Tawni . . . and/or Alberto." The jury was further instructed based on the request of the prosecutor relying upon the language of *People v. Adams*, *supra*, 169 Cal.App.4th at page 1023 that "Whether or not the defendant is aware that the attempted murder victims were within the zone of harm is not a defense as long as the victims actually were within the zone of harm."

First, we consider the type of weapons used in this case and the number of shots. Bonilla was armed with a pistol and Munoz had some type of rifle. Between them, they only fired eight or nine shots. Robert expressed that they only shot one at a time until they were out of ammunition. There were repeated shots but there was no evidence that Bonilla and Munoz were spraying bullets all over the vehicle in order to ensure Leonardo was killed by killing anyone who could have been in the vehicle.

Further, in considering where the shots that were fired hit the vehicle, it did not support that Bonilla and Munoz were creating a kill zone. A close review of the bullet evidence reveals that the bullets either hit the trunk or the left side of the car. One bullet passed over the driver's side seat and out the windshield. The evidence does not support a flurry of bullets sprayed at the entire car. Rather, it shows a targeting of the driver's

20

side of the car, which they presumed was being driven by Leonardo and those shots put those around him in risk of fatal harm but did not amount to annihilating every possible occupant of the vehicle.

Further, the evidence does not establish the distance between the truck being driven by Quiroz and Leonardo's vehicle. Tawni was able to stay ahead of Quiroz and was eventually able to escape onto a main street, where the shooting stopped. This made it more difficult for Bonilla and Munoz to create a kill zone.

Based on a review of the evidence, it was not established that the only inference from the evidence was that defendants intended to create a kill zone. It was equally as possible that they were targeting Leonardo and only had a reckless disregard for anyone who may also have been in the vehicle with Leonardo. The trial court erred by instructing the jury on the kill zone theory.

2.    *PREJUDICE*

Moreover, we conclude that the instruction was prejudicial. Here, the prosecutor argued that the attempted murders of Alberto and Tawni were based on the kill zone. The prosecutor argued that the kill zone theory applied to Tawni and Alberto. The prosecutor insisted that defendants were trying to kill Leonardo but Alberto and Tawni were also in the car so defendants were responsible for their attempted murders. As recently stated in *People v. Aledamat* (2019) 8 Cal.5th 1, 13-15, if it is not clear beyond a reasonable doubt that jurors would have rendered the same verdict absent the error, the conviction must be reversed. (See also *Chapman v. California* (1967) 386 U.S. 18, 24.) Here, based on the instructions and the argument of the prosecutor, it is not clear beyond

21

a reasonable doubt that the jurors would have rendered the same verdict absent the instructional error.

The instruction allowed the jurors to convict Defendants based solely on an intent to kill Leonardo and were not advised that they must consider the circumstances of the shooting in deciding whether there was an intent to "annihilate" everyone in the vehicle, or only that they acted with conscious disregard of the risk of serous injury or death for those around Leonardo. (*Canizales*, *supra*, 7 Cal.5th at p. 607.) As such, since the jury was presented with the improper kill zone theory, and the record supports that it relied on this theory in finding Defendants guilty of the premeditated and deliberate murders of Alberto and Tawni, reversal is required.

Moreover, although the jury was presented with another legally supported theory—that defendants also intended to kill Tawni and/or Alberto—based on the evidence, we cannot say "beyond a reasonable doubt that a reasonable jury would conclude defendants targeted [Tawni and Alberto] specifically." (*Canizales*, *supra*, 7 Cal.5th at p. 617.) It was undisputed that Defendants could not see into Leonardo's car and see that Alberto and Tawni were inside. The evidence does not support that they specifically intended to kill Alberto and Tawni when they shot into the car. As such, this theory would not support the attempted murder convictions.

Since we have reversed the attempted murder convictions with respect to Alberto and Tawni, we need not address Quiroz's additional arguments 5, 6, 7 and 8 seeking reversal of the convictions. We further need not address Bonilla's additional arguments 2, 3, 4, 5 and 7 seeking to reverse the attempted murder convictions as regards to Alberto

22

and Tawni. We also need not address the additional theories raised in the supplemental letter briefs.

      B.      <u>CONSPIRACY TO COMMIT MURDER: TAWNI</u>

Defendants contend the evidence was insufficient to support their convictions of conspiracy to murder Tawni in count 1. Bonilla contends the conviction must not stand because the intent to kill Tawni was based on the intent to kill Leonardo, which was a legally invalid theory.

The jury was instructed as to the conspiracy to kill Tawni and Leonardo, that they must find "(1) The defendant intended to agree and did agree with one or more of the other defendants to intentionally and unlawfully kill; [¶] (2) At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would intentionally and unlawfully kill; [¶] (3) One of the defendants or all of them committed at least one of the overt acts alleged to accomplish the killing." They were further instructed, "The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be the criminal act itself." They were then instructed on the overt acts for counts 1 and 2.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the

23

evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

"Conspiracy is an inchoate crime.  [Citation.]  It does not require the commission of the substantive offense that is the object of the conspiracy." (*People v. Swain* (1996) 12 Cal.4th 593, 599.)  " 'Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy.' " (*People v. Homick* (2012) 55 Cal.4th 816, 870.) " ' "The existence of a conspiracy may be inferred from the conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy." ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 515-516.)

"The necessary elements of a criminal conspiracy are:  (1) an agreement between two or more persons; (2) with the specific intent to agree to commit a public offense; (3) with the further specific intent to commit that offense; and (4) an overt act committed by one or more of the parties for the purpose of accomplishing the object of the agreement or conspiracy." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1128.)  The crime of conspiracy to commit murder includes the elements to conspire and intent to kill. (*People v. Cortez* (1998) 18 Cal.4th 1223, 1229.)  "Because there rarely is direct evidence of a defendant's intent, '[s]uch intent must usually be derived from all the circumstances

24

of the attempt, including the defendant's actions.' " (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1025.)

Here, the evidence established that Leonardo drove Tawni to Robert's house to get Robert's phone. Leonardo wanted the phone because he wanted to get in touch with Janice, and Robert had her information. When Robert got the phone back from Leonardo, Robert threatened that he would "pay" for taking the phone. While Tawni pushed Robert when she took the phone, he did not specifically threaten her or express that he was angry with her once he received back his phone.

When Quiroz picked up Robert, Quiroz immediately told him to direct him to Leonardo's trailer. There was no mention of Tawni or the woman who took his phone, by name. When Quiroz arrived to pick up Robert, Bonilla was in the truck with Munoz. Bonilla was loading his gun. The jury could reasonably conclude that Quiroz, Bonilla, and Munoz decided prior to picking up Robert that they were going to find Leonardo and shoot him. However, at this point, there was no mention of Tawni or her involvement.

Once they arrived at the trailer and discovered that Leonardo was not present, Robert was asked if Rebekkah was the female who took his phone. Robert told Defendants, no. There was no mention of Tawni by name or where she could be found, despite them asking where they could find Leonardo. Defendants got back in the truck and immediately told Robert to contact Leonardo to have him meet up with them. There was not a similar directive with respect to Tawni.

When defendants and Munoz saw Leonardo's car, they immediately started to follow it. The window tinting on Leonardo's vehicle made it impossible to see who was

25

inside. Quiroz told Bonilla and Munoz to shoot. Defendant and Bonilla then shot at Leonardo's vehicle. Tawni was not visible in Leonardo's car, and no other evidence was presented as to a pursuit of Tawni after the shooting at Leonardo's vehicle.

There was no substantial evidence presented to support that Defendants had the intent to kill Tawni. Although they asked Robert if Rebekkah had been the female who took his phone, he denied that she was, and there is no further evidence as to them asking if it was Tawni who took the phone. While it may have been circumstantial evidence that they were looking for the woman who took Robert's phone, this evidence also does not amount to circumstantial evidence that at that point they mutually agreed to kill Tawni. At no time did Robert state that defendants wanted to search for Tawni nor did defendants inquire even as to her name. They called Leonardo to meet up with him but did nothing to find Tawni.

Further, if they reached the agreement to kill Leonardo once they saw his vehicle and Quiroz told them to shoot, it was undisputed that Tawni could not be seen in the car. If their intent to kill Leonardo occurred at that moment, there was no evidence supporting that, at that same time, they reached the agreement to kill Tawni. The jury reasonably could conclude defendants had the intent to kill Leonardo based on the evidence, but not that they also had the intent to kill Tawni.

The People argue the fact that weapons were displayed at the trailer, and Bonilla shot at Leonardo's vehicle at Quiroz's direction, the jury could "circumstantially" infer that Defendants had an agreement and a specific intent to kill Tawni. While this evidence supports that they had the intent to kill Leonardo, it is pure speculation that they also

26

harbored the intent to kill Tawni. The evidence that they sought to kill Leonardo was strong in that Leonardo and Robert had issues involving Janice; Robert told Leonardo he would "pay" for taking his phone; and defendants specifically contacted Leonardo to meet up and then shot at the vehicle they knew belonged to Leonardo.

The evidence does not establish that at any point defendants entered into an agreement to kill Tawni. We find the evidence does not support the conviction of conspiracy to murder Tawni in count 1 and will reverse the conviction.

C.    PREMEDITATED AND DELIBERATE ATTEMPTED MURDER: LEONARDO

Both defendants contend that the district attorney failed to plead in the information that the attempted murders of Tawni, Leonardo, and Alberto were premeditated, deliberate, and willful. As such, defendants' rights to due process were violated by the failure to allege premeditation and deliberation, as the jury later made a specific finding as to premeditation and deliberation, and ultimately they were given life sentences for the convictions. Since we have reversed the attempted murder of Tawni and Alberto convictions, we need only consider this issue as it pertains to Leonardo.

1.    *ADDITIONAL FACTS*

Defendants were charged in the first felony complaint on April 5, 2016, with the attempted murder of Leonardo within the meaning of sections 664 and 187, subdivision (a), in that they "willfully and unlawfully" murdered him. The same charge was alleged in first and second amended complaints. Defendants were present at the preliminary

27

hearing.  The trial court found there was sufficient evidence to hold defendants on the attempted murder of Leonardo.

The information was filed on February 28, 2017.  It charged defendants in count 4 as follows:  "For a further and separate cause of action, being a different offense from but connected to its commission with the charges set forth in counts 1 through 3 hereof, the District Attorney of the County of Riverside hereby accuses [Defendants] of an attempt violation of Penal Code section 664/187, subdivision (a), a felony, in that on or about March 28, 2016, the defendants did willfully and unlawfully murder LEONARDO . . ., a human being."

On September 26, 2017, prior to trial, the prosecutor submitted a list of requested jury instructions.  This included CALCRIM No. 601 for the charge of attempted murder. CALCRIM No. 601 provides in pertinent part "If you find the defendant guilty of attempted murder . . . you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation."  Trial commenced the following month.

On October 16, 2017, Bonilla filed his request for jury instructions.  Included in his request was CALCRIM No. 601.  During discussion of the jury instructions, the trial court noted that both the prosecutor and Bonilla had requested CALCRIM No. 601. There was no objection to the instruction based on the failure to allege premeditation and deliberation in the information by either Bonilla or Quiroz.  The trial court agreed to modify the instruction, not relevant to the discussion here.  The jury was instructed with CALCRIM No. 601, and were told, "If you find a defendant guilty of attempted murder

28

in counts 3, 4 and/or 5, you must then decide whether the People have proved the additional allegation that he attempted murder was done willfully and with deliberation and premeditation."

While the parties were giving their closing arguments, the trial court emailed them the verdict forms for their approval. There were no objections to the verdict forms in regards to the finding that the jury would have to make on premeditation and deliberation. The trial court explained the verdict forms to the jurors. It advised them that only if they found the defendants guilty of the attempted murders did they have to make an additional finding as to whether the attempted murders were premeditated or deliberate.

The jury reached true findings for counts 3, 4, and 5 that the attempted murders were willful, premeditated and deliberate. The probation report recommended life sentences on counts 3, 4, and 5 for both defendants. They were each sentenced to 7 years to life on counts 3, 4, and 5.

2. *ANALYSIS*

" 'It is fundamental that "When a defendant pleads not guilty, the court lacks jurisdiction to convict him of an offense that is neither charged nor necessarily included in the alleged crime. [Citations.] This reasoning rests upon a constitutional basis: 'Due process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial.' " ' " (*People v. Parks* (2004) 118 Cal.App.4th 1, 5-6.; see also *People v. Hamernik* (2016) 1 Cal.App.5th 412, 425-426

29

[" ' "No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state or federal" ' "].)

Section 187, subdivision (a), provides, "Murder is the unlawful killing of a human being, . . . with malice aforethought."  Section 664, subdivision (a), provides that the sentence for the crime of attempted murder is one-half the term of imprisonment prescribed upon a conviction of the offense attempted.  However, it further provides, "[I]f the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole."  Section 664, subdivision (a), further provides, "The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact."

In *People v. Houston* (2012) 54 Cal.4th 1186 (*Houston*), the defendant claimed on appeal that he was improperly sentenced to life imprisonment on the attempted murder counts because the indictment failed to allege that the attempted murders were willful, deliberate and premeditated.  (*Id.* at pp. 1225-1226.)  During the presentation of the defense's case, the trial court gave the verdict forms to the parties, which included a verdict form for the jury to find the attempted murders were premeditated and deliberate.  The trial court advised the parties to let it know if the verdict forms were not right.  The

30

trial court also advised the parties that such additional allegation would result in life imprisonment rather than "five, seven, nine." (*Id.* at p. 1226.)  The verdict form was approved, the jury was instructed on the requirement to make a true finding on the attempted murders as to whether they were committed with premeditation and deliberation, and the jury entered guilty verdicts.  "Defendant did not object before the court submitted the case to the jury or at sentencing." (*Ibid.*)

On appeal, the People conceded that the indictment failed to allege that the attempted murders were deliberate and premeditated but argued that the defendant had forfeited the claim.  (*Houston*, *supra*, 54 Cal.4th at p. 1226.)  The California Supreme Court found that despite the fact the accusatory pleading did not include that the attempted murders were premeditated or deliberate, it did not require reversal of the true findings by the jury and the life sentences.  It stated, "To the extent defendant contends he was not provided adequate notice of the punishment he faced, we are not persuaded.  During the defense's presentation of its case, the trial court expressly noted that defendant, if convicted, would be sentenced to life imprisonment, and the court asked the parties to say if there was a problem with the proposed jury instructions and verdict forms.  One week later, the court said the attempted murder verdict form would include deliberate and premeditated attempted murder as a special finding.  At the close of evidence, the trial court instructed the jury to determine whether the attempted murders were willful, deliberate, and premeditated, and indicated that a special finding on this question appeared on the verdict form.  Had defendant raised a timely objection to the jury instructions and verdict forms at any of these stages of the trial on the ground that

31

the indictment did not allege that the attempted murders were deliberate and premeditated, the court could have heard arguments on whether to permit the prosecutor to amend the indictment. [Citation.] If the trial court was inclined to permit amendment, defendant could have requested a continuance to permit him to prepare a defense. [Citation.] On the facts here, defendant received adequate notice of the sentence he faced, and the jury made an express finding that the attempted murders were willful, deliberate, and premeditated. A timely objection to the adequacy of the indictment would have provided an opportunity to craft an appropriate remedy. Because defendant had notice of the sentence he faced and did not raise an objection in the trial court, he has forfeited this claim on appeal." (*Houston*, *supra*, 54 Cal.4th at pp. 1227-1228.)

Here, the issue of premeditation and deliberation was discussed several times. Defendants were put on notice when the prosecutor filed her requests for instructions prior to trial, that she was seeking to have the jurors instructed with CALCRIM Nos. 600 and 601. CALCRIM No. 600 was the instruction on attempted murder and CALCRIM No. 601 was the special finding instruction. Bonilla included the instruction in his request for instructions. Further, the trial court discussed the instructions with the parties and the jury verdict forms were given to the parties for their approval, including CALCRIM No. 601. These verdict forms included the true findings for premeditation and deliberation. There was no objection. Further, the trial court specifically explained to the jurors that they should only consider the additional allegation of premeditation and deliberation if they found the defendants guilty of the attempted murders. Defendants had ample notice that they were facing the additional allegation on the attempted murders

32

and have therefore forfeited any claim on appeal that they were not given adequate notice of the charges.

Defendants contend that the issue has not been forfeited because they received an unauthorized sentence, which they could not forfeit.

Recently, the California Supreme Court revisited the issue in *Houston* in *People v. Anderson* (July 23, 2020) 9 Cal.5th 946 (*Anderson*). In *Anderson*, the defendant was charged with various robbery and murder charges. As to the murder charges, the district attorney had alleged gun enhancements pursuant to section 12022.53 but failed to allege the enhancement for the robberies. However, the jury instructions and verdict forms included true findings for the section 12022.53 weapons use enhancements for the robbery counts. Based on the enhancements, the defendant was sentence to additional 125 years to life. (*Anderson*, at p. 1.) Defendant argued reversal of the enhancements was required because they were not adequately alleged in the information. (*Id.* at p. 3.)

The California Supreme Court found that the information "did not comply with the applicable statutory pleading requirements, nor did it comport with the due process principles underlying those requirements." (*Anderson*, *supra*, 9 Cal.5th at p. 4.) The People conceded that the information did not comply with applicable statutory pleading requirements but urged the court to uphold the sentences because the defendant received adequate notice from the jury instructions and the verdict forms. The People argued that the defendant had forfeited the argument of inadequate notice and failed to object at sentencing. (*Id.* at pp. 5-6.)

33

The *Anderson* court cited *Houston* with approval, agreeing with *Houston* that these types of pleading errors involved an "error of a different variety" than the argument that it constituted an unauthorized sentence. It noted, "By affirming on forfeiture grounds, *Houston* effectively rejected the notion that a pleading defect necessarily results in an unauthorized sentence." (*Anderson*, *supra*, 9 Cal.5th at p. 8.) However, the court distinguished its case from *Houston* and found it could reach the error because the error affected the defendant's substantial rights. (*Anderson*, at p. 9.) It distinguished *Houston*, finding that unlike the facts in *Houston*, in the instant case, "there was no midtrial discussion highlighting the prosecution's intent to seek the more serious vicarious firearm enhancements instead of the less serious personal-use enhancements charged in the information. Rather, as discussed in more detail below[,] the prosecution's intentions did not become clear until the day of the sentencing hearing. And finally, the error was one that goes to the overall fairness of the proceeding. We thus conclude this is a case where we should reach the merits of [defendant]'s claim." (*Anderson*, at p. 9.)

The *Anderson* court concluded, "This would be a different case if the prosecution had told [defendant] from the outset that it planned to seek the section 12022.53(e) enhancements as to the robbery counts but for some reason failed to include them in the information. [Citation.] But no such discussion occurred here. Here the notice given was too late to cure the defective pleading." (*Anderson*, *supra*, 9 Cal.5th at p. 10, citing to *Houston*, *supra*, 54 Cal.4th at pp. 1227-1228.)

Here, this case is more akin to *Houston*. The prosecutor gave the proposed instructions to defendant's counsel before trial, and CALCRIM No. 601 was specifically

34

tied to the attempted murder charges. Bonilla included CALCRIM No. 601 in his proposed instructions. The parties discussed at length the wording of CALCRIM No. 601 during the discussion of the jury instructions and at no time did defendants object on the ground that premeditation and deliberation was not charged in the information. Further, the probation reports included that Defendants were to be sentenced to 7 years to life on counts 3, 4, and 5; and they never objected at sentencing.

It was clear from the beginning of the case that the prosecution was pursuing the premeditation and deliberation finding on the attempted murders. By failing to raise the issue in the trial court, Defendants have forfeited the claim on appeal. (*Houston*, *supra*, 54 Cal.4th at pp. 1227-1228.)

### D.     IMPOSITION OF SECTION 12022 GUN ENHANCEMENT

Quiroz contends the trial court erred by imposing sentence on the gun allegations found true by the jury pursuant to section 12022, subdivision (a), on counts 3, 4, and 5 because these allegations were not alleged in the information but added by the trial court. He insists that it was an unauthorized sentence and a violation of his due process rights because the information was never amended to add the allegations and he did not have proper notice of the allegations. We need only address this claim as it pertains to count 4, the attempted murder of Leonardo.

#### 1.     *ADDITIONAL FACTS*

Quiroz was charged in the information with the attempted murder of Leonardo. It was additionally alleged that Quiroz (along with the same allegations for Bonilla, Munoz, and Robert) personally and intentionally discharged a firearm and discharged a firearm

35

causing great bodily injury within the meaning of section 12022.53, subdivisions (c) and (d). The trial court agreed at the conclusion of the evidence that the evidence did not support the section 12022.53 weapons use allegations alleged against Quiroz in the information and dismissed them. However, the trial court found the evidence did support that Quiroz could be convicted of violations of section 12022, subdivision (a)(1), principal armed allegations. The trial court stated, "However, there is a basis for 12022 (a)(1), which would be present when other individuals are armed. So as to all three of those counts the Court does believe that there is sufficient evidence for—to conform to the proof. So as to Counts 3, 4, and 5 that would be an added allegation. So that takes care of that." Defendant did not object to the additional allegations.

### 2. ANALYSIS

"Fair notice requires that every sentence enhancement be pleaded in connection with every count as to which it is imposed." (*Anderson*, *supra*, 9 Cal.5th at p. 5.) An "[o]ral amendment of an accusatory pleading may suffice for statutory and due process purposes. [Citation.] 'The informal amendment doctrine makes it clear that California law does not attach any talismanic significance to the existence of a written information.' " (*People v. Pettie* (2017) 16 Cal.App.5th 23, 82.)

In *People v. Toro* (1989) 47 Cal.3d 966, 976-977, disapproved of on other ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, footnote 3, the jury was presented with verdict forms for a lesser related offense that was not plead in the information. The court first noted " 'a person cannot be convicted of an offense (other than a necessarily included offense) not charged against him by indictment or information, whether or not

36

there was evidence at his trial to show that he had committed that offense.' " (*Id.* at p. 973.)  The court also stated, "However, an exception to this rule has long been recognized in cases where a defendant expressly or impliedly consents to have the trier of fact consider a nonincluded offense." (*Ibid.*)  It noted that the question presented to it was whether the failure to object to the instructions and the verdict forms amounted to consent to have the nonincluded offense submitted to the jury.  (*Id.* at pp. 973-974.)

The *Toro* court concluded, "Although informed of the proposed jury instructions on the lesser related offense of battery with serious bodily injury, and asked to state any objection, the defense did not object to the proposed instructions, or to the verdict forms, or in any other way claim unfair surprise or indicate dissatisfaction with the verdict options provided to the jury.  We conclude that this failure to object constituted an implied consent to the jury's consideration of the lesser related offense and a waiver of any objection based on lack of notice. (*People v. Toro*, *supra*, 47 Cal.3d at pp. 977–978, fn. omitted.)

Quiroz did not object to the additional allegations pursuant to section 12022, subdivision (a)(1).  While the prosecution did not move to amend the information, the trial court stated that it was adding the allegations and that it was taken care of; there was no objection by Quiroz.  Like in *Toro*, instructions on section 12022, subdivision (a), were given to the jury and the verdict forms were given to the jury containing the allegation.  At no time did Quiroz object to the additional allegations.  "[T]his failure to object constituted an implied consent to the jury's consideration of the lesser related

37

offense and a waiver of any objection based on lack of notice." (*People v. Toro*, *supra*, 47 Cal.3d at pp. 977-978.)

Nonetheless, Quiroz did have fair notice of the additional allegation. Quiroz was advised in the information that he was facing an additional allegation of personal use of a firearm enhancement in count 4. He was charged along with Bonilla, Munoz, and Robert. The preliminary hearing testimony provided that Quiroz was driving the truck when the other occupants shot at Leonardo's vehicle. This was adequate notice that he may be vicariously liable for the persons who were shooting from his vehicle while he was driving. The trial court added the additional allegation and stated that further action need not be taken. This was a proper addition of the section 12022, subdivision (a), allegation. Quiroz was properly subject to the additional one-year sentence imposed for the true finding on the section 12022, subdivision (a), allegation for count 4.

### E. WITNESS CREDIBILITY INSTRUCTIONS

Defendants insist that statements made by the trial court during voir dire amounted to advising them that they should only consider one factor when assessing witness credibility, "you have to judge them by what they say and how if what they say matches up with other evidence in the case." These comments foreclosed the jury from properly considering other factors of witness credibility as set forth in Evidence Code section 780.

#### 1. ADDITIONAL FACTS

The trial court read the list of potential witnesses to the jury panel. The trial court advised the potential jurors that the facts of the case came from the testimony of the witnesses. It was up to the jurors to determine their credibility. The jurors were told that

38

they should not base credibility on who the person was or their occupation. The trial court then told the jurors "Now, certainly you're free to take into account training and experience that a witness may have. But ultimately at the end of the day, we ask whatever yardstick you use to measure whether or not you believe or disbelieve someone has to be based solely on what they say and how if what they say matches up with the other evidence. [¶] You can take into account body language, eye contact, and, of course, how the other evidence comes out and whether it matches up. What you can't do is just base it on who they are or what they do. [¶] So that being said, we do have some witnesses that may or may not be testifying in this case. And we do like to know in advance whether or not you know any of them."

While questioning one of the jurors, the trial court asked if her experience dealing with victims would influence her ability to be a fair juror. The juror explained that she would probably believe the victim. The trial court responded, "All right. Well, again, credibility has to be based not on who they are, what their status is. A victim, I guess, is a status too. You can't just choose to believe a victim because they are labeled a victim. You have to believe them or disbelieve them based on what they say and if you believe they are telling the truth about the incident."

The trial court then questioned many of the potential jurors, "Do you think you could judge all witnesses by the same standard of credibility," or "Do you think you could judge all witnesses by the same standard."

The trial court then stated it was going to discuss the law "because Hollywood usually gets it wrong." The court discussed circumstantial evidence and reasonable

39

doubt. It read the instructions on those concepts. The court then discussed a defendants right to testify. The court stated, "Now, if any one of the three or all three decide that they wish to testify, they do not get a head start, nor do they start from behind. You have to judge them by that same yardstick of credibility that you do any other witness in the case and only base your decision on whether to believe or disbelieve them based on what they say and how if what they say matches up with the other evidence." The trial court did not state that it was reading an additional instruction on witness credibility or the right to not testify. The trial court concluded, "Those, ladies and gentlemen, are the initial instructions. You certainly will receive additional instructions in law as we go through the trial."

Later, the trial court addressed the second panel of jurors as to whether they knew any of the witnesses. The trial court again admonished the jurors that all witnesses had to be judged based on their testimony and not based on their occupation or status. The trial court stated, "You certainly can take into consideration any training or experience they might have or expertise they might have. But what you can't do is simply judge them by who they are. Rather, you have to judge them by what they say and how if what they say matches up with the other evidence in the case. Whatever yardstick you use has to be consistent with each and every witness." The trial court again advised the additional potential jurors on the concepts of reasonable doubt and circumstantial evidence. They were advised on the right not to testify. They were told, "That means that the defendants may choose to testify or not. That's entirely up to them. If any one or all of the defendants choose to testify, you have to regard them by the same standard or yardstick

40

that you would any other witness at the outset. And then as they testify, you choose whether to believe all, some, or none of what they say." The trial court again said, "That ladies and gentlemen, are the initial instructions. You'll receive additional instructions in law as we go through the trial."

Prior to the presentation of evidence, the jury was instructed with CALCRIM No. 105, and prior to deliberations they were instructed with CALCRIM No. 226. These instructions advised the jurors that they must judge the credibility of witnesses and that they must "judge the testimony of each witness by the same standards, setting aside any biases or prejudices you may have." These instructions also provided the numerous factors the jury should consider in assessing witness credibility, including how well the witness could hear or see, did the witness admit being untruthful, and other factors.

2.       *ANALYSIS*

Evidence Code section 780 provides that "Except as otherwise provided by statute, the court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing," It lists numerous factors including, demeanor while testifying, existence of motive, attitude and other factors. (Evid. Code, § 780.) CALCRIM Nos. 105 and 226 as given to the jury in this case set forth the numerous factors that the jury should consider in evaluating witness credibility.

"When instructions are claimed to be conflicting or ambiguous, 'we inquire whether the jury was "reasonably likely" to have construed them in a manner that violates the defendant's rights.' [Citation.] We look to the instructions as a whole and the entire

41

record of trial, including the arguments of counsel.  [Citations]  We assume that the jurors

are ' " 'intelligent persons and capable of understanding *and correlating* all jury

instructions . . . given.' " ' "  (*People v. Franco* (2009) 180 Cal.App.4th 713, 720; see

also *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

In *People v. Livaditis* (1992) 2 Cal.4th 759, the defendant complained that during

jury selection, the trial court briefly summarized the penalty phase process to the

potential jurors.  The defendant complained that the trial court's statements were

defective.  The California Supreme Court found, "We need not decide whether these

summary comments, by themselves, fully and correctly instructed on the deliberative

process.  The comments were not the actual complete jury instructions.  The full

instructions came at the end of the trial."  (*Id.* at p. 781.)

Initially, in reviewing the comments made by the trial court, we do not find that

the jury would have considered the comments as the instruction on witness credibility.

The trial court specifically identified that it was giving some instructions in the case

during voir dire, but the only instructions given to the jury were on reasonable doubt and

circumstantial evidence.  The trial court specifically identified at the time, that it was

giving the jury an instruction on the law, and never gave the witness credibility

instruction.  The jury reasonably could conclude that the comments made by the trial

court regarding witness credibility were not the instructions.

Further, the trial court specifically admonished the jurors during voir dire that the

instructions that it had given were not the only instructions.  They were advised that they

would be receiving additional instructions during the trial.  It is inconceivable that the

42

jurors believed that they could only consider the comments made by the trial court during voir dire in evaluating witness credibility.

Finally, based on the instructions as a whole, it is inconceivable that the jurors considered only the statements by the trial court during voir dire in assessing witness credibility. The jurors were instructed prior to the presentation of evidence with CALCRIM No. 105. Just prior to deliberations they were instructed with CALCRIM No. 206. They were also advised "Only consider the final version of the instructions in your deliberations." They were additionally advised, "Pay careful attention to all of these instructions and consider them together." Based on the instructions as a whole, the jury is presumed to have considered all of the instructions given on witness credibility, and did not rely solely on the comments made during voir dire. (*People v. Franco*, *supra*, 180 Cal.App.4th at p. 720.) We reject the contentions raised by Defendants.

F.  PRESENTENCE CUSTODY CREDITS

Bonilla contends that he was entitled to additional presentence custody credits. The People concede the error.

Bonilla was arrested on April 29, 2016, and sentenced on February 9, 2018. He was given 647 days of actual custody credit, plus 97 days conduct credit for a total of 744 days. The parties agree that Bonilla should have been given 652 days of actual custody credit and the correct calculation of credits can be raised for the first time on appeal. (See *People v. Acosta* (1996) 48 Cal.App.4th 411, 427-428 [presentence custody credits can be corrected on appeal if other issues are raised].)

We will order that the calculation of credits be corrected.

## DISPOSITION

We reverse the convictions of attempted murder of Alberto and Tawni in counts 3 and 5.  We reverse the conviction of conspiracy to commit murder of Tawni in count 1.  We vacate the sentences and remand for resentencing of both defendants.  We also order that Bonilla is entitled to five additional actual custody credits as stated in this opinion.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MILLER_____
                                        Acting P. J.


We concur:


FIELDS_____
                                J.


RAPHAEL_____
                                J.

44